**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>**v.**<br><br>**CARLOS RAMIREZ ROMERO,**<br><br>**Defendant.** | **CRIMINAL ACTION NO.**<br>**1:21-CR-394-MHC-CCB** |

## FINAL REPORT AND RECOMMENDATION

Defendant Carlos Ramirez Romero is charged with conspiring to possess with the intent to distribute methamphetamine and cocaine (Count 1), distributing methamphetamine (Counts 2 and 3), possessing with the intent to distribute methamphetamine (Count 4), possessing with the intent to distribute methamphetamine and cocaine (Count 5), possessing a firearm in furtherance of a drug trafficking crime (Count 6), possessing a firearm after having been convicted of a felony (Count 7), and conspiring to commit money laundering (Count 9). (Doc. 33). He filed a motion to suppress all evidence obtained as a result of a traffic stop that occurred on September 8, 2021. (Doc. 74). The Court held an evidentiary hearing on October 28, 2022, Defendant filed a post-hearing brief, and the Government filed a response. (Docs. 95, 103, 106). Defendant declined to file a

reply brief, and most of the matter is now ripe for review. For the reasons set forth below, I **RECOMMEND** that the motion to suppress, (Doc. 74), be **DENIED in part** and **DENIED AS MOOT in part**.

I.    Facts

A.    Events Leading Up to the Day of the Traffic Stop and Arrest

Defendant came into contact with law enforcement as early as August 11, 2021, when he sold an undercover agent one kilogram of methamphetamine. (Doc. 98 at 15–17).[1] On that day, agents set up to watch the transaction in the parking lot of the Contigo Peru restaurant, near the intersection of Indian Trail and Tech Drive in Gwinnett County, Georgia. *Id.* at 15–18. The seller arrived driving a white Nissan Maxima, and he provided one kilogram of methamphetamine in a white plastic bag to the undercover agent in exchange for $4,600 in cash. *Id.* at 16–18, 25. Agents ran the tag on the Maxima, learned that it was registered to Defendant, pulled Defendant's driver's license photo, and from that photo confirmed that Defendant was the person who sold the drugs to the undercover agent. *Id.* at 20.

Following the transaction, Defendant drove to a nearby Texaco gas station, parked the car, and walked inside. *Id.* at 18; *see also* Gov. Exh. 5 (map depicting the

---

[1] The Court cites to the transcript of the evidentiary hearing using the page numbers generated by the CM/ECF system.

Contigo Peru and the Texaco). Once Defendant left the gas station, he drove to an apartment at 3306 Tree Trail Parkway, building 33, where agents later determined that he lived. (Doc. 98 at 20–21). Agents obtained a tracker warrant for Defendant's car and surveilled him over the subsequent weeks, during which time they saw him coming and going from the apartment—which he shared with defendant Kelyn Roxana Ortiz Flores and two children. *Id.* at 21–22.

During the course of their surveillance, agents recovered trash that Defendant and Ortiz Flores discarded in a dumpster at the apartment complex. *Id.* at 22–23. In that trash, they found documents containing the apartment's address, items with Defendant's and Ortiz Flores's names, and plastic baggies with "8,000" and "10,000" written on them. *Id.* at 23. DEA special agent Evan Leyva testified that, as an experienced drug investigator, he believed the handwritten denominations indicated amounts of currency that had once been in those bags. *Id.* ("It's common that you will see money passed that's already counted and passed to the next guy specifically written on those plastic bags.").

In late August, agents observed what they believed was a second drug transaction. They saw Defendant exit his apartment, get into the white Maxima, and drive to the Contigo Peru parking lot—the same location where the first transaction occurred. *Id.* at 23. Defendant exited his car and got into the passenger

3

seat of a Dodge Challenger. *Id.* at 23–24. He engaged in a short conversation with the driver, left and went back to the Maxima, retrieved a white bag, got back into the Challenger, and gave the bag to the driver. *Id.* at 24. Agent Leyva testified that, in his opinion, Defendant's actions were consistent with a drug transaction, surmising that Defendant originally received some amount of money from the driver of the Challenger, counted it, went back to his car to get narcotics, and provided them to the driver. *Id.*

### B.   The Day of the Traffic Stop and Arrest

On September 8, 2021, the tracker on Defendant's car indicated that the vehicle left Defendant's apartment and went to a house in Conyers, where the car stayed for a short period of time before returning to Defendant's apartment. (Doc. 98 at 25). This long drive coupled with such a short stay made agents suspicious, so they went to Defendant's apartment to see what was going on. *Id.* at 25–26. Around 3:30 in the afternoon, agents observed Defendant drive past the parking lot of the apartment complex at a high rate of speed, make a U-turn, come back to the parking lot, abruptly pull into a spot, and quickly walk into his apartment. *Id.* at 26–27. A short time later, Defendant left his apartment carrying a white plastic bag (which appeared to be heavy), got into the Maxima, and drove to a parking

4

lot near a Food Depot—which is across the street from the Contigo Peru. *Id.* at 27; Gov. Exh. 5.

At this point, the surveilling DEA agents asked for assistance from the Gwinnett County Police Department. (Doc. 98 at 28–29). Agent Leyva contacted Gwinnett County Sergeant Richie, via cell phone, and asked if he could be in the area to assist with a traffic stop in the event that Defendant conducted a drug transaction. *Id.* at 29. Meanwhile, the agents saw Defendant exit the Maxima and approach the driver's side window of a Ford F150. *Id.* at 30. The agent could see Defendant talking to the driver, but he could not observe whether the two people exchanged any money or drugs. *Id.* After a brief meeting, Defendant went back to his vehicle and the F150 pulled into a more open area of the parking lot, where the agent could see the driver look down at his lap—as if he were inspecting something. *Id.* The F150 pulled out of the lot a short time later, the agent maintained surveillance, and he contacted Gwinnett County to assist with stopping the truck. *Id.*

A Gwinnett County police officer, Matthew Palminteri, testified that he was communicating directly with Agent Leyva—by phone and by a portable radio that he got from the agent. *Id.* at 118. The agent told Officer Palminteri that he believed Defendant had just engaged in a drug transaction with the driver of a white F150.

*Id.* at 120. The officer pulled behind the F150 after it left the parking lot and followed it down Indian Trail towards Interstate 85. *Id.* at 121. The officer activated the emergency lights and siren in his patrol car and attempted to stop the truck, but it fled. *Id.* at 31, 121. The county's pursuit policy did not allow the officer to give chase, and he was not able to stop the truck. *Id.*

After the F150 fled, the DEA agents checked the tracker and saw that Defendant's Maxima was at the Texaco—the same gas station where Defendant went after he sold methamphetamine to the undercover agent weeks before. *Id.* at 31–32. Agents later saw Defendant leave the Texaco and walk, emptyhanded, to the Maxima. *Id.* at 32. Defendant drove back to the Food Depot parking lot and parked near a Jeep Grand Cherokee. *Id.* at 33. Defendant went to the passenger side of the Jeep, took something out of a black satchel that he was wearing across his chest, and handed something to the driver. *Id.* at 33, 102.[2] The Jeep then left the parking lot and headed towards I-85 south. *Id.* at 33–34.

The Gwinnett County officers followed the Jeep. *Id.* at 122. Agent Leyva told them that he believed the driver had just engaged in a drug transaction with Defendant. *Id.* at 38. Gwinnett County Officer Ehrenborg attempted to stop the

---

[2] The driver of the Jeep was co-defendant Oscar Valdez Samanielo. (Doc. 98 at 33).

vehicle, and he saw the driver throw something out of the window on I-85 southbound, before the exit for Jimmy Carter Boulevard. *Id.* at 122. Officer Palminteri, who was behind Ehrenborg and the Jeep, was able to slow down and retrieve the bag that was thrown from the vehicle. *Id.* at 122–23; *see also* Gov. Exhs. 2, 3. The bag contained 350 grams of a substance that field-tested positive for methamphetamine. (Doc. 98 at 37). The Gwinnett officers were able to stop the driver of the Jeep, who in the process of the stop appeared to have destroyed his cell phones. *Id.* at 38–39 ("It appeared as if he broke them and tried to fold them in half prior to law enforcement conducting a traffic stop on him.").

Following the incident with the Jeep, Defendant returned to the Texaco. *Id.* at 39–40. Agent Leyva went to the Food Depot parking lot and began preparing an affidavit to support a search warrant application for Defendant's apartment. *Id.* Agent Leyva communicated with the Gwinnett officers, told them that Defendant was inside the Texaco playing slot machines, and informed them that he wanted to have Defendant arrested—but not in the Texaco parking lot, where there were too many people. *Id.* at 40–41. He gave the officers a description of Defendant's car and informed them that he was the person who had been the subject of the afternoon's surveillance. *Id.* at 124. Defendant stayed inside the Texaco for several

hours and, around 7:00 in the evening, he left and returned to the Maxima. *Id.* at 41–42.

Officer Palminteri saw Defendant pull out of the Texaco and turn left onto Singleton Road. *Id.* at 125; *see also* Gov. Exh. 5. The officer activated his emergency lights, and Defendant immediately pulled into the parking lot of the Jalisco supermarket—which is across the street from the Contigo Peru and down the street from the Food Depot. (Doc. 98 at 125; Gov. Exh. 5). Defendant stopped abruptly and quickly got out of his vehicle. (Doc. 98 at 125). The officer had Defendant put down his phone, and he placed him under arrest. *Id.* at 126. At that time, Defendant was wearing a satchel across his chest, which the officer confiscated. *Id.* Agents recovered just under $6,000 from inside the satchel and three phones from Defendant and the Maxima. *Id.* at 44.

After Defendant's car was stopped, a canine officer with the Gwinnett County Sheriff's Office and his dog Cino conducted a free air sniff of the vehicle. *Id.* at 138. Cino alerted to the passenger side of the Maxima, but no drugs were found inside. *Id.* at 139.

Shortly after Defendant was arrested, agents and officers moved him from the Jalisco parking lot to the Food Depot parking lot. *Id.* at 104–05. There, Task Force Officer Jake Lee read Defendant his *Miranda* rights from a preprinted card.

8

*Id.* at 105. Special Agent Naranjo, who is a native Spanish speaker, translated into Spanish what Lee was saying in English. *Id.* at 106, 164–66.[3] Defendant said that he wanted to have his attorney present. *Id.* at 106. TFO Lee then removed a chain from Defendant's neck, and Defendant became noncompliant and aggressive, suggesting that the agents were stealing his jewelry. *Id.* at 106–07, 169–70. Lee explained that Defendant was under arrest and that he could not be transported to the jail wearing a chain, and he had this conversation in English. *Id.* at 107. Defendant responded appropriately and appeared to understand English. *Id.* None of the officers threatened Defendant or unholstered their weapons. *Id.* at 46, 107, 127, 170. Nor did Defendant appear to be under the influence of alcohol or drugs. *Id.* at 107–08, 171. Defendant did, however, come across as arrogant and outspoken, and he clearly expressed his anger and discontent about what was happening. *Id.* at 46, 169–70. The agents eventually transported Defendant back to

---

[3] The preprinted card had these warnings: (1) You have the right to remain silent; (2) Anything you say can be used against you in court; (3) You have the right to talk to a lawyer for advice before we ask you any questions; (4) You have the right to have a lawyer with you during the questioning; and (5) If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish. (Doc. 98 at 167, 180; Gov. Exh. 14).

his apartment and, later that night, executed a search warrant at his residence. *Id.* at 47–48.

## II.   Analysis

In his motion, Defendant moves to suppress the evidence seized as a result of his arrest, as well as all statements that he made, arguing that there was no evidence to suggest that he committed any traffic violations to justify the traffic stop. (Doc. 74). At the hearing, however, the Government made clear that it was not relying on a theory that Defendant committed a traffic violation—rather, the Government suggested that the stop was justified by probable cause to believe that he had engaged in drug trafficking. (Doc. 98 at 9). In his post-hearing brief, Defendant argues that the two alleged transactions agents observed on the day of the arrest provide nothing more than "hunches" that criminal activity was afoot. (Doc. 103 at 3). As for the sale to the undercover agent, Defendant maintains that agents did not know who he was prior to the transaction and that a single identification based on his driver's license photo is not sufficient to establish probable cause. *Id.* He points out that agents never actually observed a drug transaction on the day of the arrest, and no drugs were found in Defendant's car. *Id.* at 4. He further argues that the detention was unlawfully prolonged given that agents never found any drugs in the car. *Id.* at 5.

The Government filed a response brief arguing that there was reasonable suspicion and probable cause to stop Defendant's car and to arrest him based on the collective knowledge of law enforcement regarding Defendant's drug trafficking activity. (Doc. 106 at 11–17). It further argues that, although it will not seek to admit Defendant's statements in its case in chief, those statements were voluntarily made for purposes of impeachment. *Id.* at 17–19. Defendant did not file a reply brief, and most of the matter is now ripe for resolution.

Defendant's motion to suppress should be denied because the Gwinnett County police officer had probable cause to stop Defendant's car based on the collective knowledge of the law enforcement officers regarding Defendant's drug trafficking activities.

 "[T]he Fourth Amendment generally requires law enforcement officers to obtain a warrant before conducting a search." *United States v. Delva*, 922 F.3d 1228, 1243 (11th Cir. 2019). There are exceptions to the warrant requirement, however, including one for automobiles. "Under the automobile exception to the warrant requirement, the police may search an automobile and the containers within it where they have probable cause to believe contraband or evidence is contained." *Id.* (internal quotation marks omitted). "For a warrantless search of an automobile to be constitutional, (1) the automobile must be readily mobile, and (2) there must

11

be probable cause to believe that it contains contraband or evidence of a crime."
*United States v. Lanzon*, 639 F.3d 1293, 1299–1300 (11th Cir. 2011). "Probable cause
exists when there is a fair probability that contraband or evidence will be found in
the vehicle under the totality of the circumstances." *Id.* at 1300. "Probable cause
deals with probabilities. These are not technical; they are the factual and practical
considerations of everyday life on which reasonable and prudent men, not legal
technicians, act." *Illinois v. Gates*, 462 U.S. 213, 241 (1983) (internal quotation marks
omitted).

Here there can be no doubt that the car was readily mobile—the officer
followed it out of the parking lot prior to initiating the traffic stop. *See, e.g., United
States v. Santana*, No. 1:17-CR-408-AT-RGV, 2018 WL 7283633, at *10 (N.D. Ga.
Sept. 19, 2018) (finding that a car was readily mobile where the trooper followed
the vehicle, pulled it over, and it stopped with no indication that it had ceased to
be operational), *adopted by* 2019 WL 365743 (N.D. Ga. Jan. 30, 2019).

The second requirement for the automobile exception is that there had to be
probable cause to believe that the vehicle contained contraband or evidence of a
crime. The Government argues that there was probable cause based on the
collective knowledge of the DEA agents. (Doc. 106 at 11–17). As the Eleventh
Circuit has held, probable cause "exists where the facts and circumstances *within*

*the collective knowledge of law enforcement officials*, of which they had reasonably trustworthy information, are sufficient to cause a person of reasonable caution to believe that an offense has been or is being committed." *United States v. Willis*, 759 F.2d 1486, 1494 (11th Cir. 1985) (internal quotation marks omitted and emphasis added). The collective-knowledge doctrine applies, however, only if the law enforcement officers "maintained at least a minimal level of communication during their investigation." *Id.* "Thus, where, like here, the Government proceeds on a 'collective knowledge' theory, the validity of the stop and subsequent search rises and falls on the level of communication between the officer who conducted the stop and the other law enforcement officers who were aware of the facts establishing probable cause." *United States v. Khan*, No. 1:17-CR-40-SCJ, 2018 WL 2214813, at *6 (N.D. Ga. May 15, 2018).

Here the level of communication between the agents and Gwinnett County officers was sufficient for the doctrine to apply. On September 8, 2021, Agent Leyva called Sergeant Richie, with the Gwinnett County Police, to ask for assistance in the event that Defendant engaged in a drug transaction. (Doc. 98 at 28–29). Gwinnett County officer Matthew Palminteri testified that he was communicating directly with Agent Leyva — by phone and by a portable radio that he got from the agent. *Id.* at 118. After the first suspected deal, the agent told

Officer Palminteri that he believed Defendant had just engaged in a drug transaction with the driver of a white F150. *Id.* at 120. After the second suspected deal, Agent Leyva again told the Gwinnett officers that he believed the driver of the Jeep had just engaged in a drug transaction with Defendant. *Id.* at 38 ("I explained to them what I saw and then relayed to him over the phone exactly the events we were able to observe."). And prior to the traffic stop of Defendant's car, Agent Leyva communicated with the Gwinnett officers, told them that Defendant was inside the Texaco playing slot machines, and informed them that he wanted to have Defendant arrested. *Id.* at 40–41. He gave the officers a description of Defendant's car and informed them that he was the person who had been the subject of the afternoon's surveillance. *Id.* at 124.

This level of communication is consistent with that of cases where judges on this court have permitted the Government to rely on the collective-knowledge doctrine. *See, e.g., United States v. Edwards*, No. 1:19-cr-76-LMM-CCB-13, 2021 WL 2947865, at *4 (N.D. Ga. July 14, 2021) (finding sufficient communication where agents informed the state officer of the suspected transaction, maintained uninterrupted surveillance on the vehicle, gave vehicle identifying information to the state officer, and maintained fairly constant contact with the state officer throughout the stop); *United States v. Guzman*, No. 1:17-CR-405-TWT-LTW-2, 2018

14

WL 7361073, at *5 (N.D. Ga. Dec. 13, 2018) (finding sufficient communication where the DEA coordinated with Georgia State Patrol prior to the operation, communicated with the GSP during the operation, and directed the GSP to stop the vehicle), *adopted by* 2019 WL 718371 (N.D. Ga. Feb. 20, 2019); *Khan*, 2018 WL 2214813, at *7 (finding sufficient minimal communications where the DEA contacted the trooper prior to the stop, the trooper was on stand-by on the date in question, the trooper had a DEA radio in his car, the DEA was communicating with the trooper by radio on the day of the stop, and the trooper knew what was happening via updates over the DEA radio); *United States v. Agarwal*, No. 1:17-CR-43-TCB-RGV, 2018 WL 3061923, at *10 (N.D. Ga. Apr. 6, 2018) (finding sufficient communications where the DEA contacted Georgia State Patrol for assistance, the trooper attended the DEA briefing on the morning of the scheduled buy, and the trooper was in communication with the DEA by phone or radio throughout the day to learn the description and movement of the vehicle as well as the timing and location of the transaction), *adopted by* 2018 WL 2181620 (N.D. Ga. May 11, 2018).

And based on the collective knowledge of the law enforcement agents, there was ample probable cause to stop and search Defendant's car even in the absence of any traffic violations. Less than one month prior to the traffic stop, an undercover DEA agent purchased one kilogram of methamphetamine from

Defendant. (Doc. 98 at 15–17). That transaction occurred in the Contigo Peru parking lot, Defendant arrived in a white Maxima, and he provided the methamphetamine in a white plastic bag. *Id.* at 16–18, 25. Shortly thereafter, agents found plastic baggies in Defendant's trash suggesting that he was handling large sums of cash. *Id.* at 23. And around the time of the trash pull, agents observed an interaction where Defendant acted consistently with how he behaved during the undercover methamphetamine sale—he left his apartment, drove to the Contigo Peru parking lot in the Maxima, had a brief conversation with the driver of another car, retrieved a bag from his own car, and gave that bag to the other driver. *Id.* at 23–24.

Defendant's behavior on the day of the arrest was also similar to that which he displayed during the known transaction and with the notion that he was still dealing drugs. That morning, he drove to a house in Conyers where he stayed for only a short period of time. *Id.* at 25. He returned to his apartment and, shortly thereafter, left carrying a white plastic bag and drove in his Maxima to a parking lot across the street from the Contigo Peru. *Id.* at 26–27. Defendant then met with the driver of the F150 who, after he left the parking lot, fled from the Gwinnett officers who attempted to pull him over. *Id.* at 30–31, 121. Following that

16

meeting—as he did on the day of the known drug sale—Defendant went to the Texaco. *Id.* at 31–32.

The probable cause only grew stronger when Defendant then met with the driver of the Jeep and handed the driver something that Defendant retrieved from the black satchel he was wearing across his chest. *Id.* at 31–33. That driver, after leaving the parking lot, threw methamphetamine from his moving vehicle while being chased by the Gwinnett officers. *Id.* at 37, 122–23. And Defendant—now following a clear pattern of conduct—returned to the Texaco after meeting with the driver of the Jeep. *Id.* at 39–40.

This collection of information—the sale of methamphetamine to the undercover agent, the trash pull, the suspected transaction with the driver of the Challenger around the time of the trash pull, the suspected sale to the driver of the F150, the fact that the driver of the F150 fled from the police, the suspected sale to the driver of the Jeep, and the fact that the driver of the Jeep threw methamphetamine out of his window while being pursued by the police—gave agents probable cause to believe that Defendant was participating in drug trafficking on the day of his arrest and that evidence of his crimes would be in the Maxima. *See, e.g., United States v. Olvera*, 178 F. App'x 373, 374–75 (5th Cir. 2006) (affirming the district court's finding of probable cause to believe that the

defendant was transporting cocaine based on interceptions of recorded phone calls and observation of defendant on the day of the suspected drug delivery); *United States v. Edenilson-Reyes*, No. 1:09-CR-361-RWS-AJB, 2010 WL 5620439, at *7–8 (N.D. Ga. Oct. 26, 2010) (finding probable cause based on conversations intercepted over the defendant's phone and subsequent observation of suspicious events that were consistent with the phone calls), *adopted by* 2011 WL 195679 (N.D. Ga. Jan. 20, 2011); *United States v. Rodriguez-Alejandro*, 664 F. Supp. 2d 1320, 1339–40 (N.D. Ga. 2009) (finding probable cause based on intercepted phone calls, a prior search and seizure, and observations corroborating the details the agents learned from the calls); *United States v. Pineda*, No. 1:06-CR-350-WSD, 2008 WL 686239, at *10–11 (N.D. Ga. Mar. 10, 2008) (finding probable cause based on intercepted phone calls suggesting that a drug transaction was going to take place and surveillance consistent with those calls).[4]

---

[4] As noted by the cases cited above, the "collective-knowledge" basis for a stop sometimes occurs where agents have intercepted phone calls suggesting that a deal will take place and then observe people behaving in a way that is consistent with the details learned through the calls. There are no intercepted calls here, but the evidence provided by the prior purchase is just as strong—if not stronger. Here, agents *knew* Defendant previously engaged in drug trafficking, and their subsequent surveillance showed Defendant continuing to act the way he did when he sold drugs to the undercover agent.

18

Defendant argues that his actions on the day of the arrest—talking to the drivers of the various cars and "bouncing back and forth between the Food Depot parking lot and a gas station across the street"—are "innocuous at best." (Doc. 103 at 2–3). The problem with this argument, however, is that it looks at Defendant's actions on the day of the arrest in a vacuum. It ignores the fact that agents *knew* Defendant had sold them methamphetamine only weeks earlier and that his actions on the day of the arrest were similar to, and consistent with, his actions on the day of the prior sale.[5] Defendant suggests that conversations and handshakes, and someone looking down at their lap while inside of a car, are everyday occurrences that gave the agents nothing more than a hunch that criminal activity might be afoot. *Id.* at 3. This argument, again, ignores the totality of the evidence that puts those everyday actions in context. Two people talking in a parking lot, with nothing more, is not probable cause that a drug transaction occurred. But it is something altogether different when a known methamphetamine dealer, following his established modus operandi, meets and talks with someone in a

---

[5] Defendant points out that the agents did not know who Defendant was prior to the sale with the undercover agent. (Doc. 103 at 3). That fact, however, does not seem very important in the grand scheme of things. Agents knew Defendant's identity after that transaction, they surveilled him, and they saw him engaging in other similar transactions.

parking lot, and that person then looks at something in their lap, drives off, and flees from pursuing police officers. And when the scene plays out again only moments later—this time with the fleeing driver throwing methamphetamine out of his window with the police in pursuit. The totality of the facts matter, and here they establish probable cause.

Defendant points out that agents did not actually observe a known drug transaction on the day of the arrest, and no drugs were found in Defendant's car. (Doc. 103 at 3–4). True enough. But the standard is not actual knowledge, it is probable cause. And probable cause "deals with probabilities." *Gates*, 462 U.S. at 241. It "exists when there is a fair probability that contraband or evidence will be found in the vehicle under the totality of the circumstances." *Lanzon*, 639 F.3d at 1300. And looking at the totality of the facts agents knew prior to arresting Defendant, there was more than a fair probability that contraband or evidence of drug trafficking would be on his person or in his car.

Defendant cites to a number of cases addressing the length of traffic stops and the notion that a stop may be unconstitutionally prolonged when the police detain a person for longer than is necessary to handle the matter for which the stop was made. (Doc. 103 at 4); *see, e.g., Rodriguez v. United States*, 575 U.S. 348, 350 (2015) (holding that a seizure justified only by a police-observed traffic violation becomes

20

unlawful if it is prolonged beyond the time reasonably required to complete the mission of issuing the ticket). But here the stop was not unconstitutionally prolonged—indeed, the officer arrested Defendant almost immediately after he pulled him over based on probable cause to believe that Defendant was dealing drugs. The Government does not contend that the stop was based on any traffic violation, and therefore Defendant has no argument that it was prolonged beyond the time needed to address a traffic violation. The stop was based on Defendant's drug activities, and he was immediately arrested based on that probable cause.[6]

In sum, the collective knowledge of law enforcement established probable cause to believe that Defendant was engaging in drug transactions on the day of

---

[6] The Government also argues that anything recovered from Defendant was validly obtained as a search incident to his arrest. (Doc. 106 at 15). The Court agrees. "A custodial arrest of a suspect based on probable cause is considered a reasonable intrusion under the Fourth Amendment, and thus a search incident to the arrest requires no additional justification." *United States v. Hearst*, No. 1:18-cr-054-RWS-AJB, 2022 WL 16832834, at *20 n.21 (N.D. Ga. Mar. 10, 2022), *adopted by* 2022 WL 8163946 (N.D. Ga. Oct. 14, 2022); *see also United States v. Ouedraogo*, 824 F. App'x 714, 720 (11th Cir. 2020) (noting that "police can routinely search individuals and personal items the individuals have on them when they are arrested and seize anything probative of proving criminal conduct"). As noted above, the officer had probable cause to believe that Defendant was dealing drugs on the day of his arrest. As such, the satchel Defendant was wearing at the time of his arrest was validly seized as part of a search incident to arrest.

his arrest, and his motion to suppress evidence seized as a result of the traffic stop should be denied.[7]

## III.  Conclusion

For the reasons stated above, the undersigned **RECOMMENDS** that Defendant's motion to suppress, (Doc. 74), be **DENIED in part** and **DENIED AS MOOT in part**. Specifically, that portion of the motion seeking to suppress Defendant's statements should be denied as moot because the Government has represented that it will not use those statements in its case in chief; the rest of the motion should be denied. This case is not yet certified ready for trial because

---

[7] There is one remaining issue, regarding Defendant's statements. The Government has represented that it will not use Defendant's statements in its case in chief. (Doc. 98 at 10). And for good reason, because the evidence shows that Defendant immediately requested an attorney after he was informed of his *Miranda* rights. *Id.* at 106. Nevertheless, the Government asks that the Court make a finding that Defendant's statements were voluntary, in the event that it decides to use those statements to impeach Defendant if he testifies.

There are a number of things that would have to occur before the voluntariness question would be ripe. Defendant would have to decide to go to trial, he would have to testify, and he would have to offer testimony subject to impeachment by one of his prior statements. Only then would the Court have to decide if those statements were voluntary. As such, the Court declines to consider the issue now. If the Government wishes to pursue this issue, closer in time to trial it should present its voluntariness arguments in a motion in limine for the District Judge to consider.

Defendant Ortiz Flores has pretrial motions pending before the undersigned. A Report and Recommendation will issue as to those motions in short order.

**IT IS SO RECOMMENDED,** this 28th day of April, 2023.

_____
CHRISTOPHER C. BLY
UNITED STATES MAGISTRATE JUDGE

23